UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Tiger Worku,

      Plaintiff,

v.

Tesla, Inc.,

      Defendant.

File No. 26-cv-131 (ECT/DLM)

**OPINION AND ORDER**

---

Vincent J. Moccio, Bennerotte & Associates, P.A., Eagan, MN, for Plaintiff Tiger Worku.

R. Brady Herman and Jake Evans, Greenberg Traurig, LLP, Atlanta, GA; and Laura Rose Hammargren and Hannah Conrad, Greenberg Traurig, LLP, Minneapolis, MN, for Defendant Tesla, Inc.

---

Tiger Worku alleges he was electrocuted by a Tesla supercharger. He brought this personal-injury case against Tesla, and Tesla moved to compel arbitration under the Federal Arbitration Act. The contract Mr. Worku signed when he purchased his Tesla vehicle requires arbitration of "any dispute arising out of or relating to any aspect of the relationship between [Mr. Worku] and Tesla." Owing to the arbitration provision's sweeping breadth, Tesla's motion raises somewhat novel and unsettled legal issues.

The better answer, I think, is to deny Tesla's motion. I conclude that the Act does not govern this agreement to the extent the agreement's reach exceeds the statute's coverage. The Act limits enforceability to controversies "arising out of such contract." 9 U.S.C. § 2. The agreement goes much further. The arbitration provision is enforceable under the Act only so far as "relationship" means "contractual relationship." However,

Mr. Worku's injury does not fall with the agreement's scope because his injury has no direct relationship with the contract.

I[1]

On August 13, 2024, Tiger Worku purchased a Tesla Model 3 from Tesla, Inc.  ECF No. 24-1 at 2.  The contract for that sale included an arbitration clause.  *Id.* at 4.  That provision reads:

> **Agreement to Arbitrate.**  Please carefully read this provision, which applies to any dispute between you and Tesla, Inc. and its affiliates, (together "Tesla").
>
> If you have a concern or dispute, please send a written notice describing it and your desired resolution to resolutions@tesla.com.
>
> If not resolved within 60 days, *you agree that any dispute arising out of or relating to any aspect of the relationship between you and Tesla will not be decided by a judge or jury but instead by a single arbitrator* in an arbitration administered by the American Arbitration Association (AAA) under its Consumer Arbitration Rules.  This includes claims arising before this Agreement, such as claims related to statements about our products.  You further agree that any disputes related to the arbitrability of your claims will be decided by the court rather than an arbitrator, notwithstanding AAA rules to the contrary.
>
> To initiate the arbitration, you will pay the filing fee directly to AAA and we will pay all subsequent AAA fees for the arbitration, except you are responsible for your own attorney, expert, and other witness fees and costs unless otherwise provided by law.  If you prevail on any claim, we will reimburse you your filing fee.  The arbitration will be held in the city or county of your residence.  To learn more about the

---

[1]     In accordance with the standards governing a Rule 56 motion, the facts are undisputed or described in the light most favorable to Mr. Worku.  *See* Fed. R. Civ. P. 56(a); *Scott v. Harris*, 550 U.S. 372, 378 (2007).

> Rules and how to begin an arbitration, you may call any AAA office or go to www.adr.org.
>
> The arbitrator may only resolve disputes between you and Tesla, and may not consolidate claims without the consent of all parties. The arbitrator cannot hear class or representative claims or requests for relief on behalf of others purchasing or leasing Tesla vehicles. In other words, you and Tesla may bring claims against the other only in your or its individual capacity and not as a plaintiff or class member in any class or representative action. If a court or arbitrator decides that any part of this agreement to arbitrate cannot be enforced as to a particular claim for relief or remedy, then that claim or remedy (and only that claim or remedy) must be brought in court and any other claims must be arbitrated.
>
> If you prefer, you may instead take an individual dispute to small claims court.
>
> You may opt out of arbitration within 30 days after signing this Agreement by sending a letter to: Tesla, Inc.; P.O. Box 15430; Fremont, CA 94539-7970, stating your name, Order Number or Vehicle Identification Number, and intent to opt out of the arbitration provision. If you do not opt out, this agreement to arbitrate overrides any different arbitration agreement between us, including any arbitration agreement in a lease or finance contract.

*Id.* at 4 (emphasis added).

On August 22, 2025, Mr. Worku attempted to charge his Model 3 at a Tesla charging station in St. Paul. Am. Compl. [ECF No. 6] ¶ 5. He alleges that when he picked up the charging connector, he received an electric shock and suffered physical and mental injuries. *Id.* ¶ 6.[2] Mr. Worku brought this suit, alleging state-law tort claims of negligence, premises

---

[2]   In its Answer, Tesla denies this allegation. ECF No. 12 ¶ 6. The allegation is considered here not for its truth but as the basis of Mr. Worku's lawsuit.

liability, and strict products liability. *Id.* ¶¶ 7–43.  Tesla moved to compel arbitration.  ECF No. 20.

II[3]

A motion to compel arbitration is analyzed either as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or as a motion for summary judgment under Rule 56, depending on how the motion is presented.  *Seldin v. Seldin*, 879 F.3d 269, 272 (8th Cir. 2018); *City of Benkelman v. Baseline Eng'g Corp.*, 867 F.3d 875, 881 (8th Cir. 2017).  Here, because "matters outside the pleadings" have been presented and considered,[4] the motion "must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d); *see City of Benkelman*, 867 F.3d at 882.

Under that standard, a motion to compel arbitration must be granted "if the movant shows that there is no genuine dispute as to any material fact" relevant to the arbitration issue and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A

---

[3]     There is subject-matter jurisdiction under the diversity statute.   28 U.S.C. § 1332(a)(1).  Mr. Worku is a citizen of Minnesota.  Am. Compl. ¶ 1.  Tesla is a citizen of Texas, its state of incorporation and where it maintains its principal place of business.  *Id.* ¶ 2.  The amount in controversy, excluding costs and interests, exceeds $75,000.  *Id.* ¶ 3. Federal question jurisdiction is lacking, because Mr. Worku raises only state-law claims, *id.* ¶¶ 7–43, and the Federal Arbitration Act is not an independent ground of federal jurisdiction, *see Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581–82 (2008).

[4]     The only extra-pleading material is the parties' contract.  ECF No. 24-1.  Ordinarily, in a breach-of-contract action, the underlying agreement would be embraced by the pleadings, and could be considered without converting a motion to dismiss into a motion for summary judgment. *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017). But this tort action does not rely on the parties' contract, so that document is not "incorporated by reference or integral to the claim" or otherwise necessarily embraced by the Amended Complaint.  *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) (citation modified).

4

fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. If a genuine dispute of material fact concerning "the making of the arbitration agreement" exists, then a federal district court "shall proceed summarily to the trial thereof." 9 U.S.C. § 4.

### III

### A

The Federal Arbitration Act provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The Supreme Court's "cases place it beyond dispute that the [Act] was designed to promote arbitration. They have repeatedly described the Act as 'embod[ying] [a] national policy favoring arbitration.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345–46 (2011) (second and third alterations in original) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)).

Courts begin by determining whether the Act applies to the agreement at issue. "After all, to invoke its statutory powers under §§ 3 and 4 to stay litigation and compel arbitration according to a contract's terms, a court must first know whether the contract itself falls within or beyond the boundaries of §§ 1 and 2." *New Prime Inc. v. Oliveira*,

586 U.S. 105, 111 (2019); *see Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 401 (1967) ("[T]he stay provisions of § 3, invoked here by respondent F & C, apply only to the two kinds of contracts specified in §§ 1 and 2 of the Act, namely those in admiralty or evidencing transactions in 'commerce.' Our first question, then, is whether the consulting agreement between F & C and Prima Paint is such a contract.").

If the Act applies, "[a] matter should not be sent to arbitration unless [1] there is a valid agreement to arbitrate and [2] the underlying dispute falls within the scope of that agreement." *Northport Health Servs. of Ark., LLC v. Posey*, 930 F.3d 1027, 1030 (8th Cir. 2019) (quoting *Telectronics Pacing Sys., Inc. v. Guidant Corp.*, 143 F.3d 428, 433 (8th Cir. 1998)); *see Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) (requiring courts to resolve issues of contract formation and the "applicability of the specific arbitration clause" before ordering arbitration); *3M Co. v. Amtex Sec., Inc.*, 542 F.3d 1193, 1198 (8th Cir. 2008) (recognizing that a federal court "must grant a motion to compel arbitration if a valid arbitration clause exists which encompasses the dispute between the parties"). The burden to show a valid arbitration agreement falls on the party moving to compel arbitration, *Ballou v. Asset Mktg. Servs., LLC*, 46 F.4th 844, 851 (8th Cir. 2022), and the burden to show the arbitration agreement is invalid or does not cover the claims at issue falls on the party resisting arbitration, *Triplet v. Menard, Inc.*, 42 F.4th 868, 870 (8th Cir. 2022).

The two steps are governed by state and federal law, respectively. Whether the parties created a valid arbitration agreement is a question of state contract law. *DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 54 (2015); *Donaldson Co. v. Burroughs Diesel, Inc.*,

581 F.3d 726, 731 (8th Cir. 2009).  "[W]ritten arbitration agreements are unenforceable under the [Act] only if state-law grounds exist to revoke the contract."  *Triplet*, 42 F.4th at 871.

If there is a valid arbitration agreement, then federal law governs the interpretation of its scope.  *See id.* at 870; *Amtex Sec.*, 542 F.3d at 1199.  "Section 2 [of the Act] is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), *superseded by statute on other grounds as recognized by*, *Finnie v. H & R Block Fin. Advisors, Inc.*, 307 F. App'x 19, 21 (8th Cir. 2009) (per curiam).  "An order compelling arbitration 'should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'"  *MedCam, Inc. v. MCNC*, 414 F.3d 972, 975 (8th Cir. 2005) (quoting *Lyster v. Ryan's Fam. Steak Houses, Inc.*, 239 F.3d 943, 945 (8th Cir. 2001)).  Of course, "a party cannot be required to submit to arbitration any dispute which he has not agreed . . . to submit."  *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960).  "The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the *question of arbitrability*, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise."  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (citation modified).  In determining whether the parties contracted to arbitrate the dispute, courts first "decide whether the arbitration clause is broad or narrow."  *Unison Co., Ltd. v. Juhl Energy Dev., Inc.*, 789 F.3d 816, 818 (8th Cir. 2015).  "If the clause is narrow, then the court determines

'whether the dispute involves an agreement collateral to the agreement containing the arbitration clause.'" *United Steelworkers of Am., AFL-CIO-CLC v. Duluth Clinic, Ltd.*, 413 F.3d 786, 789 (8th Cir. 2005) (quoting *Fleet Tire Serv. of N. Little Rock v. Oliver Rubber Co.*, 118 F.3d 619, 621 (8th Cir. 1997)). "Only if the clause is broad does the court analyze whether the dispute relates to the subject matter of the agreement." *Id.* The Eighth Circuit has described a clause requiring arbitration of claims "that not only arise from the . . . Agreement but also those 'relating to' the contract" as "the broadest language the parties could reasonably use to subject their disputes to that form of settlement, including collateral disputes that relate to the agreement containing the clause." *Fleet Tire Serv.*, 118 F.3d at 621; *accord Parm v. Bluestem Brands, Inc.*, 898 F.3d 869, 874 (8th Cir. 2018).

B

1

Start with whether the Act applies to this agreement. Section 2 governs "written provision[s] in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy *thereafter arising out of such contract or transaction*." 9 U.S.C. § 2 (emphasis added); *see Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 652 n.4 (2022) ("[T]he terms of § 2 limit the [Act's] enforcement mandate to agreements to arbitrate controversies that 'arise out of' the parties' contractual relationship."). To "arise" means to "originate," "stem," or "result (from)." *Arise*, *Black's Law Dictionary* (12th ed. 2024). It "normally refers to a causal relationship." *Viking River Cruises*, 596 U.S. at 652 n.4.

8

Under the plain meaning of the statute, the Act does not govern agreements to arbitrate controversies that do not arise out of the contract or transaction. Call this the "contractual nexus theory." *See* David Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633, 643 (2020) (describing the "arising out of" language as a "contractual nexus" that restricts the Act's application to "disputes that are tied . . . in some meaningful way to the parties' agreement"); *see also* Stephen E. Friedman, *The Lost Controversy Limitation of the Federal Arbitration Act*, 46 U. Rich. L. Rev. 1005, 1015–18 (2012) (arguing that "arising out of" limits the scope of enforceable arbitration provisions to controversies about the contract).

A growing number of courts have concluded that arbitration agreements are not enforceable under the Act to the extent they exceed the "arising out of such contract or transaction" limitation. Judge Diarmuid O'Scannlain was one of the first to note the full effect of this statutory language. His concurrence in *Revitch v. DIRECTV, LLC*, concluded that § 2's "arising out of" language "must exclude claims that are completely unrelated to the underlying contract or transaction." 977 F.3d 713, 722 (9th Cir. 2020) (O'Scannlain, J., concurring). A handful of courts now agree that these "infinite arbitration clauses," to use Professor Horton's term, exceed the scope of the Act. *See Calderon v. Sixt Rent a Car, LLC*, 5 F.4th 1204, 1213–14 (11th Cir. 2021) (concluding that § 2's "arising out of" language implies that "claims so tangentially related to the underlying contract" are not subject to the Act); *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 119–20 (2d Cir. 2025) (construing § 2 to limit arbitration to claims arising from the contract); *Abbas v. Truist Bank*, 774 F. Supp. 3d 929, 944–45 (M.D. Tenn. 2025) (same); *In re Zelis Repricing*

*Antitrust Litig.*, Nos. 25-11092-BEM *et al.*, 2026 WL 604995, at *4 (D. Mass. Mar. 4, 2026) (characterizing this position as "the growing weight of authority"); *Tao v. Murphy*, 812 F. Supp. 3d 1117, 1127 (D. Nev. 2025) ("Courts increasingly read Section 2's arising-out-of language and any nexus limitation to require a causal relationship between the arbitration-clause-containing contract and the dispute.").

The Eighth Circuit has not directly addressed this theory, but its cases provide modest evidence that it would agree. In *Fleet Tire Services*, the court wrote that an agreement to arbitrate controversies or claims "'relating to' the *contract*" "*constitutes the broadest language the parties could reasonably use* to subject their disputes to that form of settlement, including collateral disputes that relate to the agreement containing the clause." 118 F.3d at 621 (emphasis added). A subsequent panel approvingly quoted this language about twenty years later. *Parm*, 898 F.3d at 874. It follows that using broader language—such as "any dispute arising out of or relating to *any aspect of the relationship* between you and Tesla," ECF No. 24-1 at 4 (emphasis added)—would not reasonably subject to arbitration disputes unrelated to the contract.[5] Some Eighth Circuit cases could be read to cast doubt on this conclusion, but I do not believe they do. In *Amtex Security*, the court mentioned "clauses which require arbitration of 'any' or 'all' disputes" without

---

[5] Complicating the matter is that *Parm*'s arbitration agreements appeared to have infinite language. *See* Horton, *supra*, at 666. The first contract covered "[a]*ny claim, dispute or controversy, . . . arising from or relating to* the credit offered or provided to you; *the actions of yourself, us or third parties*; or the validity of this Arbitration provision. *Parm*, 898 F.3d at 872 (emphasis added). The second contract used similar language. *Id.* In the end, the court interpreted the provisions as limited or tethered to the subject of the underlying agreements. *See id.* at 874–75.

10

suggesting that these provisions fell outside the Act's purview.  542 F.3d at 1199.  The court's point was that the agreement at issue, which required arbitration of three specific categories of dispute, was broad, even though it could have been broader.  *See id.*  Because it is not obvious whether the court meant "any or all disputes arising from the contract" or "any and all disputes between the parties," it would be unwise to construe *Amtex Security* to create tension with *Fleet Tire Services* and *Parm*.  More recently, an Eighth Circuit panel quoted similar but more forceful language from the Eleventh Circuit without commentary on the specific issue:

> "If the cruise line had wanted a broader arbitration provision," the [Eleventh Circuit] explained, it should have left the scope of it at "*any and all disputes, claims, or controversies whatsoever*" instead of including the limitation that narrowed the scope to only those disputes, claims, or controversies "relating to or in any way arising out of or connected with the Crew Agreement, these terms, or services performed for the Company." *That would have done it*, but the company did not do that.

*Anderson v. Hansen*, 47 F.4th 711, 716 (8th Cir. 2022) (emphasis added) (quoting *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir. 2011)).  The Eighth Circuit did not say whether it agreed with that proposition, so I do not read *Anderson* to imply approval of infinite arbitration clauses.[6]  *See United States v. Coleman*, 961 F.3d 1024, 1030 n.4 (8th Cir. 2020) (declining to rely heavily on Supreme Court dicta "because the Court did not engage in any analysis" of the issue at hand).  I conclude from these cases that the Eighth

---

[6]    The dicta in the quoted passage is directly undermined in the Eleventh Circuit by *Calderon*, which held that a suit not arising out of the underlying contract was not subject to arbitration under § 2.  5 F.4th at 1213–14.

11

Circuit has not expressly adopted the contractual nexus theory, but that some of its precedents are consistent with and modestly support the theory.

It is true that some courts have enforced infinite arbitration clauses, but these cases are distinguishable or not persuasive. The Tenth Circuit "construe[d] the language of the Act broadly to cover agreements to arbitrate a dispute not arising out of the contract containing the arbitration agreement so long as the other requirements of the Act are satisfied." *Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 13 F.3d 330, 333 (10th Cir. 1993). But the court was responding to the argument that a dispute that predated the arbitration agreement was not subject to the Act, a contention squarely rejected by the statute. *See id.*; 9 U.S.C. § 2 (governing agreements "to submit to arbitration an existing controversy arising out of such a contract"). And as Judge O'Scannlain pointed out, *Zink* did not consider whether § 2 limited the Act's application. *Revitch*, 977 F.3d at 722 n.2 (O'Scannlain, J., concurring). Similarly, the Fourth Circuit ruled that an infinite arbitration clause should be enforced without considering whether the language exceeded the scope of § 2. *Mey v. DIRECTV, LLC*, 971 F.3d 284, 292–95 (4th Cir. 2020). There, the court analyzed the infinite language as a problem of the provision's scope, and, applying the strong pro-arbitration canon, found that the dispute was arbitrable. *Id.* However, whether the Act applies to the arbitration provision is antecedent to the question of the clause's scope because § 2's contractual nexus, like § 1's transportation-worker exception, is a threshold issue. *See Oliveira*, 586 U.S. at 111 ("[A] court must first know whether the contract itself falls within or beyond the boundaries of §§ 1 and 2."). Another court suggested that the contractual nexus theory resembled the "wholly groundless" exception

12

to clauses delegating arbitrability to arbitrators, which the Court struck down in *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63 (2019). *See Christian v. Uber Techs., Inc.*, 775 F. Supp. 3d 272, 280–81 (D.D.C. 2025). Applying *Henry Schein*, the court determined that the delegation clause stripped it of "power to determine whether a claim is arbitrable, or 'arises out of' the underlying contract." *Christian*, 775 F. Supp. 3d at 281. The agreement at issue here lacks a delegation clause, so *Christian* is distinguishable. *See* ECF No. 24-1.

The contract between Tesla and Mr. Worku exceeded the scope of the Act. It required them to arbitrate "any dispute arising out of or relating to any aspect of [their] *relationship*." ECF No. 24-1 at 4 (emphasis added). This provision is facially broader than the Act, which governs arbitration agreements "arising out of such [a] *contract or transaction*." 9 U.S.C. § 2 (emphasis added). As the Fourth Circuit explained, an arbitration agreement covering "all disputes and claims between [the parties]," which "includes, but is not limited to . . . claims arising out of or relating to any aspect of the relationship between us," was "far broader" than provisions covering disputes "arising out of or related to the underlying contract." *Mey*, 971 F.3d at 293 (citation modified)). Tesla believed the phrase "relating to any aspect of the relationship" was "intentionally expansive and extends to tort and statutory claims that have any factual or legal connection to the parties' ongoing relationship." ECF No. 23 at 10–11. Since the parties' relationship can be broader than their contract, this arbitration clause goes beyond the limitations of § 2.

Elsewhere in its briefing and during oral argument Tesla construed the language more narrowly, but this construction is unpersuasive. Tesla argued that Mr. Worku's

13

"alleged use of the Tesla supercharger was an integral part of the relationship *established by the* [*contract*], as charging infrastructure and related services are a foreseeable and essential component of Tesla vehicle ownership." *Id.* at 11 (emphasis added); *see* ECF No. 28 at 7 ("[Mr. Worku's] use of the Supercharger network, designed to charge Teslas, was not an accidental or incidental connection to Tesla. To the contrary, it was a direct exercise of the charging capability that Tesla vehicle ownership provides and that forms a central part of the relationship the [contract] established."). At oral argument, Tesla initially pressed the provision's expansive reach, but eventually took the position that "the relationship" meant "the contractual relationship." The problem with this view is that the limiting language is not in the agreement. The parties could have written narrower terms, such as all "controversies arising from or relating to this Contract or the *relationships which result from this Contract*," *Green Tree Fin. Corp.–Ala. v. Randolph*, 531 U.S. 79, 83 n.1 (2000) (emphasis added), but they did not.

However, whether I accept Tesla's narrow interpretation makes no difference to the outcome. Either way, the arbitration agreement is enforceable only to the extent that the underlying dispute arises out of the contract. Courts that follow the contractual nexus theory look to the facts of the dispute to determine whether § 2's "arising out of" requirement is met.[7] *See Abbas*, 774 F. Supp. 3d at 944–45 ("Even assuming that the

---

[7]   It seems worth asking whether it is correct to determine the Act's applicability by considering the dispute's facts. The Act states that "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. In other words, the Act says that certain arbitration provisions are enforceable—ones in which the parties agree to arbitrate controversies arising out of the contract. The most

plaintiffs' claims arise out of or relate to their relationship with [the defendant], the dispute between the plaintiffs and [the defendant] in this case simply does not arise out of a contract containing a written provision to settle by arbitration a controversy." (citation modified)); *Revitch*, 977 F.3d at 723–24 (O'Scannlain, J., concurring) ("Federal courts are required to compel arbitration for those controversies that actually stem from the contract containing the arbitration clause.  But when the dispute is wholly unrelated to the contract, the FAA is silent; federal courts have no power to compel arbitration."); *Davitashvili*, 131 F.4th at 124 (finding the arbitration clause "unenforceable as to Plaintiffs' claims"); *Runzi*, 713

---

straightforward interpretation is that enforceability is about what the parties wrote, not what they did.  Properly speaking, the Act applies to contracts, not to controversies.

One way to understand this provision is that it makes enforceable those arbitration agreements that stay within the Act's limitations, but does not govern arbitration agreements that are written more broadly.  If the arbitration agreement is wider than the Act, the agreement will be entirely unenforceable under the Act.  Put another way, the Act plays by a "Price Is Right" rule—if you go past the upper limit, you get nothing.  In this version, there is no need to look to the facts of the dispute; an arbitration provision will be unenforceable simply because it overshoots the statute.

Though this interpretation has some textual appeal, I will not adopt it.  Case law is admittedly sparse, but all the relevant cases I have reviewed implicitly reject it.  That is, they determine the Act's application by looking to the underlying dispute, not the provision's language.  Additionally, the Act's "policy is to make 'arbitration agreements as enforceable as other contracts, but not more so.'" *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)).  The "Price Is Right" rule would make arbitration agreements less enforceable than some other contracts.  Consider non-compete clauses.  In Minnesota, they are subject to the "blue pencil doctrine," which allows courts to modify overly broad provisions and enforce them to the extent they are reasonable. *See Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1047 (D. Minn. 2019); *Bess v. Bothman*, 257 N.W.2d 791, 794 (Minn. 1977) ("The rationale of the blue pencil doctrine is that a court is merely enforcing the legal parts of a divisible contract rather than making a new contract for the parties.").  Determining the threshold "arising out of" question by considering the underlying controversy is akin to blue penciling the arbitration agreement and enforcing it to the extent it accords with the Act.

F. Supp. 3d at 1364 ("[T]he FAA applies only to controversies that arise out of the contract that contains the arbitration clause."). And some courts have applied or assumed the contractual nexus theory, but nevertheless enforced an infinite arbitration clause because the underlying controversy arose from the contract. *Patel v. Fan Duel, Inc.*, No. 24-CV-7402 (VSB), 2026 WL 1256838, at *6–7 (S.D.N.Y. May 7, 2026); *N.Y. Knicks, LLC v. Maple Leaf Sports & Ent. Ltd.*, No. 23-CV-7394 (JGLC), 2024 WL 3237563, at *9 (S.D.N.Y. June 28, 2024).

2

Mr. Worku contends that the arbitration agreement is invalid and unenforceable under Minnesota law[8] in two ways. In his first theory, there was no genuine offer or acceptance because the parties did not have a meeting of the minds as to the scope of the arbitration clause. ECF No. 26 at 11, 18; *see Pine River State Bank v. Mettille*, 333 N.W.2d 622, 626–27 (Minn. 1983) (explaining that in Minnesota, a contract is formed by a specific and definite offer, acceptance, and consideration); *SCI Minn. Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 864 (Minn. 2011) ("Mutual assent entails a meeting of the minds concerning a contract's essential elements." (citation modified)). His second theory is that the arbitration agreement is unconscionable if it is interpreted as broadly as its plain language implies. ECF No. 26 at 21; *see Plummer v.*

---

[8]   The parties agree that Minnesota law applies. The contract provides that it is to be "governed by, and interpreted according to, the laws of the State in your address indicated on your Vehicle Configuration." ECF No. 24-1 at 5. The "Vehicle Configuration" portion of the contract does not show Mr. Worku's full address, but it shows a Minnesota ZIP code. *Id.* at 2.

*McSweeney*, 941 F.3d 341, 345 (8th Cir. 2019) (recognizing unconscionability as a ground to invalidate an arbitration agreement under the Act).

As to the first theory, it is really aimed at contract interpretation, not contract formation. The key provision requires arbitrating "any dispute arising out of or relating to any aspect of the relationship between you and Tesla." ECF No. 24-1 at 4. As Mr. Worku sees it, none of the key terms are ambiguous, but "dispute" and "relationship" should not be "strictly construed" according to their ordinary meaning, because that interpretation would lead to harsh or absurd results.[9] ECF No. 26 at 13–15. This is unlike a typical mutual-assent case, where an essential term was omitted from the contract and could not be supplied, *see Malevich v. Hakola*, 278 N.W.2d 541, 544 (Minn. 1979); *TNT Props., Ltd. v. Tri-Star Devs. LLC*, 677 N.W.2d 94, 101–02 (Minn. Ct. App. 2004), or the offer and acceptance contained different terms, *see Lake Co. v. Molan*, 131 N.W.2d 734, 739 (Minn. 1964). It is hard to understand how the parties could have failed to mutually assent if the contract's terms were known, identical in offer and acceptance, and unambiguous. By all objective manifestations, a contract was formed. ECF No. 24 ¶ 2; ECF No. 24-1 at 2 (showing that on August 13, 2024, Mr. Worku agreed to buy a Model 3 from Tesla for $44,130); *see Washburn-McReavy Funeral Corp.*, 795 N.W.2d at 864 ("Whether mutual assent exists is tested under an objective standard."). This argument more properly concerns the scope of the agreement.

---

[9]     Mr. Worku also discusses Tesla's "affiliates," ECF No. 26 at 13–14, but it is not necessary to interpret that term. Tesla is the only other party in the case.

On Mr. Worku's second theory, the infinite arbitration provision is unconscionable. It is not necessary to reach this argument because § 2 limits the enforceable scope of the provision, so the allegedly unconscionable interpretations are not at issue. But even if I did reach this argument, I would reject it. In Minnesota, courts may decline to enforce a contract's unconscionable provisions, as follows:

> (1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.
>
> (2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

Minn. Stat. § 336.2-302. "An unconscionable contract is one which no man in his senses and not under delusion would make on the one hand, and no honest and fair man would accept on the other." *Residential Funding Co. v. Terrace Mortg. Co.*, 725 F.3d 910, 917 (8th Cir. 2013) (citation modified). "To establish unconscionability, a party must demonstrate that it had no meaningful choice but to deal with the other party and to accept the contract as offered." *Id.* (citation modified). The Minnesota Supreme Court "has never explicitly formulated an approach for determining whether a contract is unconscionable," *Maslowski v. Prospect Funding Partners LLC*, 994 N.W.2d 293, 306 (Minn. 2023) (Moore, J., concurring), but courts applying Minnesota law generally require "the party asserting unconscionability [to] show that the contract is both procedurally and substantively

unconscionable," *Carlson v. BMW Fin. Servs. NA, LLC*, 762 F. Supp. 3d 820, 826 (D. Minn. 2025) (citing *Butler v. ATS Inc.*, No. 20-cv-1631 (PJS/LIB), 2021 WL 1382378, at *19 (D. Minn. Apr. 13, 2021)).

Mr. Worku has not shown that the arbitration provision was procedurally unconscionable. As Tesla points out, he could have opted out of mandatory arbitration by mailing a letter within thirty days of his purchase. *See* ECF No. 24-1 at 4. In other words, he had a "meaningful choice" not to "accept the contract as offered." *Residential Funding Co.*, 725 F.3d at 917 (citation modified); *see Mainville v. Coll. Town Pizza, Inc.*, 629 F. Supp. 3d 913, 922 (D. Minn. 2022) (finding arbitration provision with opt-out clause was conscionable); *McMurray v. AT&T Mobility Servs., LLC*, No. 21-cv-414 (DWF/DTS), 2021 WL 3293540, at *3 (D. Minn. Aug. 2, 2021) (same). Mr. Worku does not address the opt-out provision in his brief, *see* ECF No. 26, even though Tesla relied on that language in its brief multiple times, *see* ECF No. 23 at 2–3, 8–9. Because the agreement was not procedurally unconscionable, this argument fails.

The provision is not substantively unconscionable either. It is true that courts have sometimes declined to enforce infinite arbitration provisions, pointing to the "absurd results" that might ensue. *Smith v. Steinkamp*, 318 F.3d 775, 777 (7th Cir. 2003). As Judge Posner hypothesized in *Steinkamp*,

> if Instant Cash murdered Smith in order to discourage defaults and her survivors brought a wrongful death suit against Instant Cash . . . , Instant Cash could insist that the wrongful death claim be submitted to arbitration. For that matter, if an employee of Instant Cash picked Smith's pocket when she came in to pay back the loan, and Smith sued the employee for conversion, he would be entitled to arbitration of her claim.

19

*Id.* Following this logic, some courts have found it "would clearly be unconscionable" to force parties to arbitrate "a tort action arising from a completely separate incident" from the contract. *In re Jiffy Lube*, 847 F. Supp. 2d at 1263; *see Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 503 (E.D.N.Y. 2016); *McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 275–77 (S.D.N.Y. 2021) (noting that most of the few courts to consider infinite arbitration clauses take "a jaundiced view of the argument"). Consider the court's hypotheticals in *Wexler*, involving a contract for wireless phone services.

> If Wexler were hit by a Mobility delivery van, or if she tripped over a dangerous condition in a Mobility store, her tort claim would have to go to arbitration. If she bought shares of stock in Mobility and later claimed a decrease in share price was the result of corporate malfeasance, her securities-fraud claim would have to go to arbitration.

211 F. Supp. 3d at 503.

There are two reasons to reject this line of argument. First, it is easy to multiply absurdities, but the Eighth Circuit has instructed courts to focus on the facts of the case before them. In *Parm*, the plaintiffs argued that accepting the defendants' view of arbitration provisions in a financing agreement could, in theory, subject disputes over car accidents, exploding cell phones, and sexual harassment to arbitration. 898 F.3d at 878. The court brushed these concerns aside. "The glaring issue with these hypotheticals is that they in no way inform the question before the court because we must 'look . . . to the underlying factual allegations and determine whether they fall within the scope of the arbitration clause.'" *Id.* (quoting *Amtex Sec.*, 542 F.3d at 1199).

Second, "*Jiffy Lube* and other opinions" apply the unconscionability doctrine in a way that "draws the very inference *Concepcion* prohibits: that there is something inherently troubling about private dispute resolution." Horton, *supra*, at 665–66. *Concepcion* reaffirmed the Supreme Court's prior statement "that a court may not 'rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what . . . the state legislature cannot.'" 563 U.S. at 341 (quoting *Perry v. Thomas*, 482 U.S. 483, 493 n.9 (1987)). The Act's purpose was to place arbitration agreements on "equal footing" with other contracts. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006). A ruling that it is substantively unconscionable to arbitrate all future claims between two parties is, if not directly foreclosed, at least in tension with the reasoning in this case law.

3

After determining that there is a valid arbitration agreement, the next question is whether the clause, to the extent it is enforceable under the Act, covers the dispute. *Posey*, 930 F.3d at 1030. Recall that courts first "decide whether the arbitration clause is broad or narrow," *Unison Co.*, 789 F.3d at 818, and if the clause is broad, the "court analyze[s] whether the dispute relates to the subject matter of the agreement." *Duluth Clinic, Ltd.*, 413 F.3d at 789. And "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24–25. The Eighth Circuit "generally construe[s] broad language in a contractual arbitration provision to include tort claims arising from the contractual relationship" and enforces such provisions. *Hudson*,

21

484 F.3d at 499–500; *see CD Partners, LLC v. Grizzle*, 424 F.3d 795, 800–01 (8th Cir. 2005).

The agreement here is broad. It covers "any dispute arising out of or relating to any aspect of the [contractual] relationship between you and Tesla." ECF No. 24-1 at 4; *see Parm*, 898 F.3d at 874 (treating similar language as broad). "Because the arbitration clause is broad, we must then determine whether the underlying factual allegations touch on matters covered by the arbitration clause." *Unison Co.*, 789 F.3d at 819.

In *Anderson*, the Eighth Circuit explained that for a dispute to "arise" out of a contract, the factual allegations "must have some 'direct relationship' with" the contract. 47 F.4th at 718. There, Katherine Anderson was an independent contractor who attended an Aflac work conference, where she was drugged and raped by an Aflac employee, Jeffrey Hansen. 47 F.4th at 713. Ms. Anderson had previously contracted with Aflac to arbitrate "any dispute arising under or related in any way to this Agreement," and other Aflac employees were third-party beneficiaries who could enforce the agreement. *Id.* at 713–14. After settling with Aflac, Ms. Anderson sued Mr. Hansen for battery, assault, false imprisonment, and loss of consortium, and Mr. Hansen moved to compel arbitration. *Id.* at 714. The court first determined that the agreement was broad, and asked whether the factual allegations touched on matters covered by the arbitration clause. *Id.* at 715 (citing *Unison Co.*, 789 F.3d at 819). Following opinions from the Fifth and Eleventh Circuits, it found that "broad" did not mean "all encompassing." *Id.* at 717; *see Jones v. Halliburton Co.*, 583 F.3d 228, 235 (5th Cir. 2009); *Doe*, 657 F.3d at 1218. "Applying *Doe*'s definitions of 'arising' and 'related to' to the present case means that the Andersons'

22

underlying factual allegations of sexual assault must have some 'direct relationship' with the Andersons' *Associate's Agreements* to be arbitrable." *Anderson*, 47 F.4th at 718 (citing *Doe*, 657 F.3d at 1218). No such direct relationship was present. *Id.* "The parties could each have fulfilled all of their duties under the Associate's Agreements and Katherine Anderson could have perfectly performed her services for Aflac, and the parties would still be embroiled in the dispute alleged in the tort claims." *Id.* (citation modified). The court found it relevant that Mr. Hansen could have committed the alleged torts even if there were no arbitration agreement, so "the facts underlying the Andersons' tort claims [did] not touch matters covered by the Andersons' Arbitration Agreements in light of the Agreements' limiting language requiring the 'dispute arise under or relate in any way to the Associate's Agreements.'" *Id.* (citation modified).

This case deserves the same outcome. Mr. Worku alleges Tesla acted tortiously with respect to a supercharger in a St. Paul parking lot, and that he was injured by that conduct. Compl. ¶¶ 6–7. The contract does not cover that scenario. It discusses the vehicle's purchase price, delivery, transfer of title, hardware, warranty—standard terms for the sale of a car. Aside from an incorporated provision that no party identifies, it does not discuss superchargers.[10] If Tesla and Mr. Worku fulfilled all their duties under the contract,

---

[10] The contract mentions superchargers once. In the provision regarding "Privacy Policy; Payment Terms for Services; [and] Supercharger Fair Use Policy," the contract reads, "Tesla's Customer Privacy Policy; Payment Terms for Services and Supercharger Fair Use Policy are incorporated into this Agreement and can be viewed at www.tesla.com/about/legal." ECF No. 24-1 at 5. That website links to the terms of use for the Supercharger Fair Use Policy. *See Privacy and Legal*, Tesla, www.tesla.com/about/legal (last visited June 25, 2026). Under "Payment Terms" there is a provision that reads, "Except to the extent set out in applicable law, Tesla will not be liable for any damage or

Mr. Worku still would have tort claims for his alleged electrocution.  In other words, this tort suit does not "aris[e] from the same set of operative facts covered by a contract between the parties to the agreement."  *CD Partners*, 424 F.3d at 800.  Even applying the strong pro-arbitration canon, I conclude with "positive assurance" that the clause does not cover Mr. Worku's claims.  *Parm*, 898 F.3d at 873–74.

Tesla's contrary argument is not persuasive.  It contends that Mr. Worku's "use of the Supercharger network, designed to charge Teslas, was not an accidental or incidental connection to Tesla.  To the contrary, it was a direct exercise of the charging capability that Tesla vehicle ownership provides and that forms a central part of the relationship the [contract] established."  ECF No. 28 at 7.  There are several problems with this.  As Mr. Worku points out, the superchargers are compatible with other manufacturers' vehicles.  Answer [ECF No. 12] at 7 ¶ 17 ("The Supercharger Station was comprised of 12 stalls each equipped with its own Supercharger; the first four stalls were called the 'universal stalls' because they were equipped with non-Tesla connectors that could charge non-Tesla electric cars.").  Mr. Worku's alleged injury is conceivable if he were charging, say, an electric Honda or Ford.  Furthermore, it is possible to own a Tesla without agreeing to the contract at issue.  Mr. Worku could have purchased a used Tesla from a third-party, or a friend could have gifted him a Model 3.  Even if using superchargers is integral to owning a Tesla

---

loss suffered as a result of your use of a charging station or Tesla's payment processes."  *Terms of Use*, Tesla, https://www.tesla.com/legal/terms (last visited June 25, 2026).  The context suggests it is about loss caused by the payment process, not physical injuries like electrocution.  Regardless, because the parties have not identified this provision or shown that it (or something similar) was in effect during August 2024, it will not be considered here.

vehicle, it does not follow that using them is integral to the contract.  And lastly, the contract does not discuss superchargers aside from mentioning and incorporating a "Supercharger Fair Use Policy," ECF No. 24-1 at 5, and no party discusses that provision. Tesla's argument that the "Supercharger network" is "a central subject of the [contract]" is unconvincing.  ECF No. 28 at 7.

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendant Tesla, Inc.'s Motion to Compel Mandatory Arbitration [ECF No. 20] is **DENIED**.


Dated:  June 25, 2026                              s/ Eric C. Tostrud
                                                   Eric C. Tostrud
                                                   United States District Court

25